Alkemal Sing. Pte. Ltd. v. DEW Glob. Fin., LLC, 2017 NCBC 110.

STATE OF NORTH CAROLINA

HENDERSON COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1406

ALKEMAL SINGAPORE PTE LTD,

Plaintiff,

v.

DEW GLOBAL FINANCE, LLC and
DONALD E. WASHINGTON III,

Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO AMEND
ANSWER AND PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

1.      **THIS MATTER** is before the Court on Defendants' Motion to Amend Answer (the "Motion to Amend") and Plaintiff's Motion for Partial Summary Judgment (the "Motion for Partial Summary Judgment"). The Motion to Amend and the Motion for Partial Summary Judgment are collectively referred to as "the Motions." Having considered the Motions, the briefs, and the arguments of counsel, the Court **DENIES** the Motions.

> *Tuggle Duggins P.A., by Richard W. Andrews and Jeffrey S. Southerland, for Plaintiff.*
>
> *Law Firm of John C. Hensley, Jr., P.C., by John C. Hensley, Jr., for Defendants.*

Robinson, Judge.

## I.      INTRODUCTION

2.      This litigation arises out of Plaintiff Alkemal Singapore Private Limited's ("Alkemal" or "Plaintiff") efforts to secure financing for a new business venture through the services of Defendants DEW Global Finance, LLC ("DEW") and Donald

E. Washington, III ("Washington") (collectively, the "Defendants"). Defendants offered to connect Alkemal to an unidentified investor who Defendants represented had the ability to provide a standby letter of credit for $20 million if Alkemal wired $2.6 million to DEW as a service fee. Alkemal and DEW agreed to Joint Escrow Instructions pursuant to which DEW would serve as escrow holder and Washington would serve as escrow officer for the transaction. Thereafter, various versions of a Bank Instrument Lease Agreement, which identified Avion Consulting Group, LLC ("Avion") as the entity that would provide the standby letter of credit, were executed by some, but not all, of the parties. DEW, Avion, and Velocity Partners Limited ("Velocity Partners") then executed a Funds Release Escrow Agreement whereby DEW would lease the standby letter of credit that Avion procured from an undisclosed lessor, and Velocity Partners would serve as the escrow agent. The parties dispute whether Alkemal agreed to the terms of the Bank Instrument Lease Agreements or the Funds Release Escrow Agreement. After Alkemal wired $2.6 million to DEW, DEW retained a $400,000 fee for itself and forwarded the remainder of the funds to Velocity Partners. The documents received by Alkemal purporting to show that a standby letter of credit had been issued were later determined to be fraudulent. Alkemal never received the standby letter of credit or a refund of any part of the $2.6 million it delivered to Defendants to obtain the letter of credit.

## II. PROCEDURAL HISTORY

3. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

4.    Alkemal initiated this action by filing the Complaint on August 19, 2015. The Complaint asserts claims against Defendants for breach of contract, breach of fiduciary duty, constructive fraud, fraud, negligent misrepresentation, civil conspiracy, conversion, unfair and deceptive trade practices ("UDTP"), unjust enrichment, constructive trust, and for an accounting. (Compl. 5–14, ECF No. 1.) The Complaint also asserted many of the same claims against Avion and its owner, Timothy J. Carre a/k/a Tim Carr ("Carr"), and two other business entities not relevant to the Motions, JPierce Investments, Inc. ("JPierce") and Loria Trading Group, S.A. ("Loria"). (Compl. 9–14.) These other defendants were later voluntarily dismissed by Alkemal. Plaintiff did not name as a defendant in this action Velocity Partners, the entity to which DEW allegedly forwarded $2.2 million—the $2.6 million wired by Plaintiff to DEW minus the $400,000 "fee" DEW retained for itself.

5.    This action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated August 21, 2015 and assigned to the Honorable Louis A. Bledsoe, III, Special Superior Court Judge for Complex Business Cases, by order dated August 24, 2015. This case was later reassigned to the undersigned by order dated July 5, 2016.

6.    On October 23, 2015, Defendants filed their Answer and Crossclaims ("Answer"). Defendants later voluntarily dismissed their crossclaims.

7.    After completion of discovery, on July 31, 2017, Plaintiff filed its Motion for Partial Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)") and a brief in support.

8. After briefing on Plaintiff's Motion for Partial Summary Judgment was complete, Defendants filed their Motion to Amend pursuant to Rule 15(a) and a brief in support on October 2, 2017.

9. The Court held a hearing on the Motions on November 29, 2017, at which all parties were represented by counsel.

10. The Motions have been fully briefed and are now ripe for resolution.

### III. FACTUAL BACKGROUND

11. The Court does not make findings of fact when ruling on a motion for summary judgment. The following background, drawn from the evidence submitted in support of and in opposition to Plaintiff's Motion for Partial Summary Judgment, is intended to provide context for the Court's analysis and ruling and is solely for purposes of this Order and Opinion.

### A. The Parties

12. Alkemal is a private limited company organized under the laws of Singapore. (Compl. ¶ 1; Br. Supp. Pl.'s Mot. Partial Summ. J. Ex. A, ¶ 3, ECF No. 78.1 ["Pl.'s Br. Supp."].) Daljit Singh ("Singh") is a director of Alkemal. (Defs.' Br. Opp'n Pl.'s Mot. Partial Summ. J. 3, ECF No. 82 ["Defs.' Br. Opp'n"]; Defs.' Br. Opp'n Ex. A.2, ECF No. 83.) Puneeta Singh Wasan ("Wasan") is the manager of Alkemal. (Pl.'s Br. Supp. Ex. A, ¶ 2.) Neither Singh nor Wasan are parties to this litigation.

13. DEW is a Florida limited liability company that maintains its principal office and place of business in Henderson County, North Carolina. (Compl. ¶ 2.) DEW was formed in 2010 and does business as Criss-Cross Financial Group ("Criss-

Cross"). (Defs.' Br. Opp'n Ex. A, ¶ 3.)

14. Washington is the sole member of DEW. (Compl. ¶ 4.)

**B.** **Alkemal Seeks Financing for a New Business Venture**

15. In the summer of 2014, Alkemal sought to procure financing needed to engage in a new business venture related to importing and exporting timber. (Compl. ¶ 11; Pl.'s Br. Supp. Ex. A. ¶ 4.)

16. In September 2014, Mike Mwara ("Mwara"), a representative of CB Morgan Capital Group and a non-party to this litigation, introduced Alkemal to Defendants. (Pl.'s Br. Supp. Ex. A, ¶ 5; Defs.' Br. Opp'n Ex. A, ¶ 5.) Alkemal and Defendants discussed a transaction whereby DEW would procure a $20 million leased standby letter of credit for Alkemal in exchange for Alkemal paying DEW a $2.6 million service fee. (Compl. ¶¶ 13–15.) During these discussions, Wasan explained to Washington that Alkemal needed the standby letter of credit by September 29, 2014 because Alkemal had cargo that was at risk of confiscation. (Defs.' Br. Opp'n Ex. A, ¶ 21.)

**C.** **DEW's Service Proposal**

17. On September 24, 2014 at 10:25 p.m., Mwara e-mailed Wasan a copy of a service proposal for a standby letter of credit (the "Service Proposal") prepared by DEW. (Pl.'s Br. Supp. Ex. A.1.) Mwara asked that Wasan execute and return the Service Proposal at her earliest opportunity so that Defendants could send her "the other bunch [of documents] tonight so that we can beat the Friday deadline" for procuring the letter of credit. (Pl.'s Br. Supp. Ex. A.1.)

18.     The Service Proposal stated that it was Criss-Cross's proposal for professional services and outlined the proposed transaction. (Pl.'s Br. Supp. Ex. A.1.) The Service Proposal stated that "[i]f [Criss-Cross] and/or one of our investment partners decide to facilitate the Alkemal transaction[,]" the "most likely terms" of the agreement were that Scotia Bank, or a similar bank, would issue a leased standby letter of credit to Alkemal in the amount of $20 million. (Pl.'s Br. Supp. Ex. A.1, § 1.) The Service Proposal requested that Alkemal provide a corporate resolution demonstrating that Alkemal had decided to proceed with the transaction. (Pl.'s Br. Supp. Ex. A.1, § 1.) The Service Proposal also stated that it was standard protocol to require Alkemal to execute a service agreement and an escrow agreement before proceeding with the transaction. (Pl.'s Br. Supp. Ex. A.1, § 2.) In exchange for Criss-Cross's services, Alkemal was to pay a service fee of $2.6 million, which was thirteen percent of the value of the $20 million standby letter of credit. (Pl.'s Br. Supp. Ex. A.1, § 3.) The Service Proposal was signed by Washington as President/CEO of DEW, but was not signed by Singh as a director of Alkemal. (Pl.'s Br. Supp. Ex. A.1.)

19.     On September 26, 2014, Alkemal submitted the requested directors' resolution to Defendants, asserting that Alkemal accepted the Service Proposal and authorized Singh to execute any related agreements for the proposal and transaction. (Defs.' Br. Opp'n Ex. A, ¶ 10, Ex. A.2.) The resolution was signed by Singh and one other individual as directors of Alkemal. (Defs.' Br. Opp'n Ex. A.2.)

**D.     The Escrow Instructions Between DEW and Alkemal**

20.     On September 26, 2014 at 9:02 a.m., Washington e-mailed Mwara a copy of

"the escrow agreement" and asked that he "have [his] clients review, execute and return ASAP." (Pl.'s Br. Supp. Ex. A.2.) Mwara then forwarded the e-mail to Wasan at 12:16 p.m. that same day. (Pl.'s Br. Supp. Ex. A.2.) At the hearing, Plaintiff's counsel represented that the document attached to that e-mail was the Joint Escrow Instructions (the "Escrow Instructions"). (*See* Pl.'s Br. Supp. Ex. A.2 ["Escrow Instructions"].)

21. The Escrow Instructions identified the parties to the transaction as DEW and Singh, individually and as a director of Alkemal. (Escrow Instructions § 1.01.) The Escrow Instructions provided that DEW would serve as both "Provider" and "Escrow Holder," and Alkemal was identified as "CLIENT." (Escrow Instructions § 1.01.) The Escrow Instructions also provided that Washington would serve as "Escrow Officer," but did not further define that term or assign any specific duties to the Escrow Officer. (Escrow Instructions 1.)

22. Section 2.03 of the Escrow Instructions stated that "CLIENT has requested Provider to introduce CLIENT to an Investor" who is able to provide a standby letter of credit in the amount of $20 million. (Escrow Instructions § 2.03.) In exchange, DEW was to receive "a reasonable fee for services in acting as Escrow Holder in fulfilling these Instructions and in the performance of its duties as Escrow Holder pursuant to its letter agreement with Provider." (Escrow Instructions § 3.03.) The Escrow Instructions provided that DEW's Financial Services Fee would be $2.6 million. (Escrow Instructions § 4.01.)

23.     The Escrow Instructions detailed how the transaction would proceed, and prohibited DEW, as Escrow Holder, from "mak[ing] any disbursement of funds except as described" in the Escrow Instructions. (Escrow Instructions Art. IV.)  The instructions provided that, immediately upon execution of the Escrow Instructions, Alkemal was to deposit a Financial Services Fee of $2.6 million into DEW's bank account with Bank of America.  (Escrow Instructions § 4.01.)  Upon receipt of the Financial Services Fee, DEW, as the Provider, was to deliver to Alkemal "any reasonable document that evidence[d] cash or cash equivalents under the control of the Provider" in an amount no less than $20 million.  (Escrow Instructions § 4.02.)  Upon delivery of such documentation, Alkemal was to have three banking days to verify that the documents were genuine.  (Escrow Instructions §§ 4.02–03.)  If Alkemal failed to notify DEW, in writing, within three days that the documents were "not acceptable due to specifically identified misrepresentations or fraud," the close of escrow would occur, entitling DEW to the $2.6 million Financial Services Fee. (Escrow Instructions § 4.04.)  If Alkemal objected to the documents, DEW would have two days to correct the deficiency or DEW would be obligated "immediately thereafter [to] refund the entire Financial Services Fee" to Alkemal.  (Escrow Instructions § 4.04.)  Additionally, the Escrow Instructions provided that, should DEW fail to provide any documentation whatsoever to Alkemal within seven days after Alkemal deposited the Financial Services Fee, DEW would be obligated, upon Alkemal's written demand, to refund the entire fee.  (Escrow Instructions § 4.05.)

24.     The Escrow Instructions also prohibited assignment or delegation of the parties' rights and duties, (Escrow Instructions § 5.07), and required any amendment or cancellation of the instructions to be in writing, executed by all parties, (Escrow Instructions § 5.03).

25.     The Escrow Instructions stated that they would "become binding on the date last executed by a Party and only upon execution by all Parties." (Escrow Instructions § 5.10.) The Complaint alleges and the Answer admits that Washington, on behalf of DEW, and Alkemal signed the Escrow Instructions on September 26, 2014. (Compl. ¶ 16; Answer & Crosscls. ¶ 16, ECF No. 12 ["Answer"].) Notwithstanding Plaintiff's allegation and Defendants' admission, both parties have produced copies of the Escrow Instructions that are signed by Washington on behalf of DEW, but which do not contain a signature on behalf of Alkemal. (Pl.'s Br. Supp. Ex. A.2; Defs.' Br. Opp'n Ex. A.3.)

**E.     Bank Instrument Lease Agreements**

26.     On or about September 26, 2014—the same day that the Escrow Instructions were sent to Alkemal—Defendants informed Alkemal that Avion, an entity that Defendants sought out to participate in the transaction, had agreed to have the standby letter of credit issued by an undisclosed investor. (Defs.' Br. Opp'n Ex. A, ¶¶ 13, 15.) Thereafter, three versions of a Bank Instrument Lease Agreement (the "Lease Agreement") were drafted, (Defs.' Br. Opp'n Exs. A.4, A.5, A.9), however, the parties dispute whether Alkemal agreed to be bound by any of the three versions, (Pl.'s Br. Supp. 8 & n.3; Defs.' Br. Opp'n 5–7). All three versions of the Lease

Agreement are nearly identical except for the date, the parties to the agreement, the amount of the leasing fee, and the signatures on the agreement. (*See* Defs.' Br. Opp'n Exs. A.4, A.5, A.9.)

### 1. Common Provisions of the Three Versions of the Lease Agreement

27. Each version of the Lease Agreement identified the Applicant's Representative and the Lessee as parties to the agreement. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, at 1.) The Lease Agreement stated that "[t]he Applicant's Representative represent [sic] on behalf of itself and the *undisclosed* Lessor ("Lessor") who is willing to use a credit facility at a certain bank or banks to cause the issuance of a Standby Letter of Credit . . . which the Lessee agrees to lease[.]" (*E.g.*, Defs.' Br. Opp'n Ex. A.4, at 1 (emphasis in original).) The Applicant was defined as the Lessor of the standby letter of credit. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ A.1.)

28. The Lease Agreement defined a standby letter of credit generally as "a written obligation of an issuing bank to pay a sum of money to a beneficiary when the obligor of an underlying obligation does not pay the beneficiary." (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ A.14.a.) The Lease Agreement identified the parties involved in the proposed standby letter of credit transaction as: (1) the applicant; (2) the issuing bank; (3) the beneficiary; and (4) the advising bank, none of whom were parties to the Lease Agreement. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ A.14.d.) The applicant was defined as the bank customer who applied to the issuing bank for the standby letter of credit. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ A.14.d(1).) The beneficiary was defined as the party in whose favor the standby letter of credit was issued, usually a lender or a

creditor to whom the Lessee was obligated. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ A.14.d(3).) The advising bank was defined as the bank that represented the beneficiary, and it was permitted to accept the standby letter of credit on the beneficiary's behalf. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ A.14.d(4).)

29. The Lease Agreement provided procedures for the issuance of the standby letter of credit that differed from those in the Escrow Instructions. The Lease Agreement stated that the Lessee and the Applicant's Representative were to reach agreement on various "Primary Documents," which were to include the Lease Agreement and an Escrow Funds Release Agreement, before setting a closing date on which to execute those documents. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(i)b–e.) After the Primary Documents were executed, "the Lessee [was to] deposit the Leasing Fee with the Escrow Agent and thereby into the Escrow account to be governed pursuant to the Escrow Funds Release Agreement." (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(i)f.) The Lease Agreement stated that the Primary Documents, which included the Escrow Funds Release Agreement, were to be attached to the Lease Agreement as exhibits, (*e.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(i)e), and the Lease Application, which was attached as Exhibit A to the Lease Agreement, stated that an escrow agreement was to be attached as Exhibit C to the Lease Agreement, (*e.g.*, Defs.' Br. Opp'n Ex. A to Ex. A.4).

30. After the Issuing Bank delivered the standby letter of credit to the Receiving Bank, the Escrow Agent was to verify the authenticity of the standby letter of credit. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(i)h.) After authenticating the standby

letter of credit, the Escrow Agent "ha[d] the duty to authenticate that the notification was in fact directly sent to the Escrow Agent from the Issuing Bank[,]" which could be done through e-mail with the bank officer of the Issuing Bank that was handling the transaction. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(i)h (emphasis omitted).) The Escrow Agent "also ha[d] the duty to authenticate that the SWIFT receipt contain[ed] an 'Authentication Result: success' result and a MIR/MOR (or TMIR/TMOR) code proving transmission." (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(i)h.) Upon completing these authentications, the Escrow Agent was to release the Leasing Fee to the Applicant's Representative. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(i)h.) If the Escrow Agent determined that the documents were not sent to the Escrow Agent by the Issuing Bank, or if the Escrow Agent did not authenticate that the SWIFT receipt contained the required authentication result, then the Escrow Agent was directed to close the escrow and deliver all remaining escrowed funds back to the Lessee. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(ii).) The Lease Agreement further provided that if "for any reason [the Applicant's Representative] fail[ed] to have the Issuing Bank issue the Standby and deliver it to the receiving Bank within thirty (30) days after deposit into escrow, then the Escrow Agent [was to] close the Escrow and return all remaining sums on deposit to the Lessee." (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(iii).)

31. The Lease Agreement also had several exhibits. Exhibit A was the Lease Application in which the Lessee was to apply to the Applicant's Representative for a lease of the standby letter of credit. (*E.g.*, Defs.' Br. Opp'n Ex. A to Ex. A.4.) The Lease Application provided that the Lessee was in agreement with the terms of the

Lease Agreement and "underst[ood] and agree[d] that we [would] utilize an independent escrow agent and escrow agreement, both defined in Exhibit C. [sic] attached hereto." (*E.g.*, Defs.' Br. Opp'n Ex. A to Ex. A.4.) An attachment to the Lease Application provided Avion's "General Policy Terms," which provided that the Leasing Fee required by the Lease Agreement would be "paid into an escrow with a third party escrow and only delivered to [the Applicant's Representative.]" (*E.g.*, Defs.' Br. Opp'n sched. 2 to Ex. A to Ex. A.4.) Exhibit B to the Lease Agreement set out the Leasing Fee that the Lessee would be required to deposit in the escrow account within twenty-four hours of execution of the Lease Agreement. (*E.g.*, Defs.' Br. Opp'n Ex. B to Ex. A.4.) Exhibit C was titled "Escrow Agreement (Three Party Escrow Agreement)," but was an otherwise blank page to which no other document was attached. (*E.g.*, Defs.' Br. Opp'n Ex. C to Ex. A.4.)

### 2. The September 25th Lease Agreement

32. The earliest Lease Agreement is dated September 25, 2014 (the "September 25th Lease Agreement") and named Avion as the Applicant's Representative and Alkemal as the Lessee. (Defs.' Br. Opp'n Ex. A.4, at 1.) The September 25th Lease Agreement was signed by Singh on September 26th, 2014 on behalf of Alkemal but was not signed on behalf of Avion. (Defs.' Br. Opp'n Ex. A.4, at 13.) Singh's signature also appears on Exhibit A to the Lease Agreement and the attached schedules that called for the Lessee's signature. (Defs.' Br. Opp'n Ex. A & scheds. 1–3 to Ex. A.4.) Exhibit B to the September 25th Lease Agreement provided that the Leasing Fee for the transaction would be $2.6 million. (Defs.' Br. Opp'n Ex. B to Ex. A.4.) Exhibit C

referenced an attached document for the Escrow Agreement but no such document was attached. (Defs.' Br. Opp'n Ex. C to Ex. A.4.)

### 3. The September 26th Lease Agreement

33. The Lease Agreement dated September 26, 2014 (the "September 26th Lease Agreement") named Avion as the Applicant's Representative and named both DEW and Alkemal as Lessee. (Defs.' Br. Opp'n Ex. A.5, at 1.) Defendants contend that this second Lease Agreement naming DEW and Alkemal as Lessee was required by Avion for compliance reasons. (Defs.' Br. Opp'n 5–6, Ex. A, ¶ 18.) The September 26th Lease Agreement was signed on September 26, 2014 by Singh, on behalf of Alkemal, and by Washington, on behalf of DEW. (Defs.' Br. Opp'n Ex. A.5, at 13.) The September 26th Lease Agreement was not signed by Avion. (Defs.' Br. Opp'n Ex. A.5, at 13.) Exhibit A to the Lease Agreement and the attached schedules that call for the Lessee's signature were also signed by Singh and Washington. (Defs.' Br. Opp'n Ex. A & scheds. 1–3 to Ex. A.5.) As with the September 25th Lease Agreement, Exhibit B listed the Leasing Fee for the transaction as $2.6 million, (Defs.' Br. Opp'n Ex. B to Ex. A.5), and Exhibit C referenced an attached document for the Escrow Agreement but no such document was attached, (Defs.' Br. Opp'n Ex. C to Ex. A.5).

### 4. The September 29th Lease Agreement

34. The final Lease Agreement was dated September 29, 2014 (the "September 29th Lease Agreement") and named Avion as the Applicant's Representative but listed only DEW as the Lessee. (Defs.' Br. Opp'n Ex. A.9, at 1.) The September 29th Lease Agreement was signed by Carr on behalf of Avion and by Washington on behalf

of DEW, however it was not signed on behalf of Alkemal. (Defs.' Br. Opp'n Ex. A.9, at 13.) In contrast to the earlier Lease Agreements, the September 29th Lease Agreement listed the Leasing Fee as $2.2 million. (Defs.' Br. Opp'n Ex. B to Ex. A.9.) As with the earlier Lease Agreements, Exhibit C referenced the attached document for the parties' Escrow Agreement, but no such document was attached. (Defs.' Br. Opp'n Ex. C to Ex. A.9.)

## F.     The Funds Release Escrow Agreement

35.    The final document submitted by the parties for the Court's consideration is the Funds Release Escrow Agreement (the "Funds Release Agreement"), which bears a similar but not identical title to the Primary Document identified in the Lease Agreement as the "Escrow Funds Release Agreement." The Funds Release Agreement stated that it was made by and among: (1) Avion; (2) DEW and Alkemal as Lessee; and (3) Velocity Partners as the Escrow Agent. (Defs.' Br. Opp'n Ex. A.6, at 1.)

36.    The Funds Release Agreement stated that Avion and the Lessee were parties to the "Lease Agreement of even date," and that "Avion, the Lessee and the Escrow Agent [were] parties to this Escrow Agreement." (Defs.' Br. Opp'n Ex. A.6, at 1.) The Funds Release Agreement further stated that "Avion and the Lessee desire to release the Escrowed Funds pursuant to the terms of the Escrow Agreement[.]" (Defs.' Br. Opp'n Ex. A.6, at 1.)

37.    The Funds Release Agreement provided procedures for the issuance of the standby letter of credit and the release of the escrowed funds that are identical to

those in the Lease Agreement. (Defs.' Br. Opp'n Ex. A.6, §§ 2–3.) The signature page bore the type-written date of September 26th and was signed on behalf of Avion by Carr, on behalf of DEW by Washington, and on behalf of Velocity Partners by Peter McLaughlin ("McLaughlin"). (Defs.' Br. Opp'n Ex. A.6, at 8.) Only McLaughlin's signature is dated, and it bears the date of September 29, 2014. (Defs.' Br. Opp'n Ex. A.6, at 8.) The Escrow Agreement stated that the Leasing Fee for the transaction is $2.2 million. (Defs.' Br. Opp'n Ex. A.6, at 8.)

### G. Alkemal Wires $2.6 Million to DEW's Bank Account

38. On September 29, 2014, Alkemal wired $2.6 million (the "Alkemal Funds") to DEW's bank account. (Compl. ¶ 18; Answer ¶ 18; Pl.'s Br. Supp. Ex. G, ECF No. 78.7.)

39. Defendants retained a $400,000 fee for their services before releasing the remainder of the Alkemal Funds to Velocity Partners. (Compl. ¶ 20; Answer ¶ 20.) Washington testified that this was done ten minutes or one hour after the Alkemal Funds were transferred. (Pl.'s Br. Supp. Ex. B, 30:19–21, ECF No. 78.2.) According to Defendants, even though the service fee had been sent, Avion would not proceed with the transaction until it received the executed Lease Agreement and Funds Release Agreement. (Defs.' Br. Opp'n 7, Ex. A, ¶ 24.) Defendants, therefore, claim to have executed the September 29th Lease Agreement and Funds Release Agreement with Alkemal's knowledge and consent to ensure that Alkemal would receive the standby letter of credit by its September 29, 2014 deadline. (Defs.' Br. Opp'n 7, Ex. A, ¶ 25.)

40. Velocity Partners received a fraudulent e-mail purportedly from a representative of Scotia Bank, the bank that was to issue the standby letter of credit, and then closed the escrow account, retained a $55,000 escrow fee, and wired the remaining Alkemal Funds ($2.6 million less the $400,000 retained by Defendants and the $55,000 escrow fee retained by Velocity Partners) to Avion and the other parties previously dismissed from this action. (Compl. ¶¶ 21–22; Answer ¶¶ 21–22.)

**H.     Alkemal Requests a Refund of the Alkemal Funds**

41. On September 30, 2014, Wasan sent an e-mail to Washington requesting that Defendants refund the $2.6 million because Alkemal did not receive the standby letter of credit by its September 29th deadline. (Pl.'s Br. Supp. Ex. A.5, at 7.) Washington and Wasan exchanged e-mails over the next week wherein Wasan requested a refund and information on why the standby letter of credit had not been received, and Washington replied that he was working to find a solution. (Pl.'s Br. Supp. Ex. A.5.)

42. In two separate e-mails sent by Wasan on October 3, 2014, Wasan referred to Washington as her escrow agent. In the first e-mail, Wasan told Washington that "you are my escrow [sic] and the money is to be sitting with you till [sic] there is confirmation on the [standby letter of credit] receipt." (Pl.'s Br. Supp. Ex. A.5, at 3–4.) Wasan's second e-mail to Washington stated that "you are my escrow [sic] and I am unaware of any further agreements you have behind the scene[.]" (Pl.'s Br. Supp. Ex. A.5, at 3.) Washington responded by e-mail, stating that he had "received a notification from the escrow attorney that the escrow conditions were satisfied, and

the funds were released to satisfy the escrow conditions." (Pl.'s Br. Supp. Ex. A.5, at 1.) Washington further stated that he "absolutely understand[s] the urgency of an immediate resolution[,]" but that he only had limited information because "we only provision the instrument transactions and are not involved in the delivery of them." (Pl.'s Br. Supp. Ex. A.5, at 2.) In the days that followed, Washington and Wasan continued working to locate the standby letter of credit to no avail. (Pl.'s Br. Supp. Ex. A.6.)

### I. **Alkemal Learns that It Received Fraudulent Documentation**

43. In late 2014 or early 2015, Alkemal and its bank received e-mails and documentation, purportedly from Scotia Bank, that appeared to confirm the transmission of the standby letter of credit. (Compl. ¶ 29; Pl.'s Br. Supp. Ex. A.7, at 4.) Alkemal, in attempting to confirm that Scotia Bank issued the standby letter of credit, learned that Scotia Bank was not involved with any transaction involving Alkemal and that the e-mails and documents Alkemal had received were fraudulent. (Pl.'s Br. Supp. Ex. A.7, at 1–2, Ex. A.8.)

### IV. DEFENDANTS' MOTION TO AMEND

44. On February 10, 2017, the Court entered a Case Management Order in which the Court set March 15, 2017 as the deadline for the parties to amend their pleading, (Case Management Order 8, ¶ B.1, ECF No. 65), a deadline which the parties proposed in their Case Management Report, (Case Management Report 3, ECF No. 60). The Case Management Order further set June 30, 2017 as the discovery deadline. (Case Management Order 4, ¶ A.1.)

45. Following the completion of discovery and briefing on Plaintiff's Motion for Partial Summary Judgment, Defendants filed their Motion to Amend on October 2, 2017. (ECF No. 85.) Pursuant to Rule 15(a), Defendants seek leave to amend two paragraphs of their Answer in which they admit allegations of the Complaint. (Mot. Am. Answer 1, ECF No. 85.) Defendants now seek to deny the allegations in paragraphs 16 and 18 of Plaintiff's Complaint, which allege:

16. On or about September 26, 2014, Alkemal signed [the Escrow Instructions] with DEW and Washington. . . . Under the [Escrow Instructions], DEW and Washington would serve as the escrow holder and escrow officer, respectively.

. . . .

18. On or about September 29, 2014, Alkemal wired the sum of $2,600,000.00 to DEW as required by the [Escrow Instructions] and the agreement of DEW and Washington to procure the Letter of Credit (the "Alkemal Funds").

(Compl. ¶¶ 16, 18.) Defendants answered by stating:

16. It is admitted that on September 26, 2014, Alkemal and DEW signed [the Escrow Instructions] and that under the [Escrow Instructions] DEW and Washington would serve as the escrow holder and escrow officer respectively. Except as admitted, denied.

. . . .

18. It is admitted that on or about September 29, 2014, Alkemal wired the sum of $2,600,000.00 to DEW as required by the [Escrow Instructions], the terms of which speak for themselves. Except as admitted, denied.

(Answer ¶¶ 16, 18.)

46. Under Rule 15(a), a party may amend a pleading to which no responsive pleading is permitted at any time within thirty days after it is served. N.C. Gen. Stat.

§ 1A-1, Rule 15(a). Thereafter, the party may only amend its pleading by leave of court or by written consent of the adverse party, and leave shall be freely given when justice so requires. *Id.* The party opposing the motion bears the burden of establishing that it will be materially prejudiced by the amendment. *N. River Ins. Co. v. Young*, 117 N.C. App. 663, 671, 453 S.E.2d 205, 210 (1995). A motion for leave to amend is addressed to the sound discretion of the trial court. *E.g., Draughon v. Harnett Cty. Bd. of Educ.*, 166 N.C. App. 464, 467, 602 S.E.2d 721, 724 (2004). Reasons justifying denial of a motion to amend are undue delay, bad faith, dilatory motive, repeated failure to cure defects by previous amendments, undue prejudice, and futility of amendment. *Bodie Island Beach Club Ass'n v. Wray*, 216 N.C. App. 283, 288–89, 716 S.E.2d 67, 73 (2011). "In deciding if there was undue delay, the trial court may consider the relative timing of the proposed amendment in relation to the progress of the lawsuit." *Draughon*, 166 N.C. App. at 467, 602 S.E.2d at 724. "[A] trial court may appropriately deny a motion for leave to amend on the basis of undue delay where a party seeks to amend its pleading after a significant period of time has passed since filing the pleading and where the record or party offers no explanation for the delay." *Rabon v. Hopkins*, 208 N.C. App. 351, 354, 703 S.E.2d 181, 184 (2010) (denying motion to amend answer where defendants "fail[ed] to offer a sufficient explanation for the nine-month delay in seeking to amend their answer").

47.     Defendants argue that when they filed their Answer, they believed Alkemal had signed the Escrow Instructions and that they should now be allowed to amend their Answer "to reflect what all parties now know is true so that this matter may be

decided on the merits." (Defs.' Br. Supp. Mot. Amend Answer 1, ECF No. 86.) Defendants further argue that they moved without delay to amend their Answer once Plaintiff attached a copy of the unsigned agreement to its brief in support of the Motion for Partial Summary Judgment, before which time Defendants were unaware that Alkemal never signed the Escrow Instructions. (Defs.' Reply Supp. Mot. Amend Answer 2, ECF No. 92.) Defendants contend that, prior to that time, they "had no reason to question the veracity of Plaintiff's allegation that it had signed" the Escrow Instructions. (Defs.' Reply 2.) Plaintiff counters that Defendants' Motion to Amend should be denied on the basis of undue delay, undue prejudice, and futility. (Pl.'s Resp. Opp'n Defs.' Mot. Amend 1–2, ECF No. 90.) Plaintiff argues that the requested amendment is not based on new information that was not readily ascertainable by Defendants, but rather, that (1) Defendants produced a copy of the Escrow Instructions that was unsigned by Alkemal in discovery on September 7, 2016, (Pl.'s Resp. Opp'n Defs.' Mot. Amend 4, ECF No. 90); (2) the unsigned document was provided to Defendants as an exhibit at Washington's deposition, which was taken over three months before Defendants filed the Motion to Amend, (Pl.'s Resp. Opp'n 4–5); and (3) that Defendants did not serve any discovery requests or take any depositions as part of this lawsuit, (Pl.'s Resp. Opp'n 4).

48. In arguing that they did not unduly delay in moving to amend, Defendants rely on *Davis v. Rudisill*, 209 N.C. App. 587, 706 S.E.2d 784 (2011). The Court finds that case to be clearly distinguishable from the current procedural situation. In *Davis*, the complaint in a medical malpractice action alleged that the plaintiff came

to the defendant clinic to have his blood drawn on a particular date but was turned away because he had not followed the clinic's instructions for fasting prior to a blood draw. *Davis*, 209 N.C. App. at 589, 706 S.E.2d at 786. Although defendants stated in their answer that the plaintiff had in fact come to the clinic that day, subsequent evidence revealed that defendant clinic had been closed on the date alleged and the trial court allowed defendants to amend their answer during trial to reflect that fact. *Id.* Our Court of Appeals affirmed, finding that there was no undue delay in seeking to amend where the plaintiff had been aware for some time that defendants were contending the clinic was in fact closed that day and where all of the evidence produced in discovery revealed that the clinic had been closed. *Id.* at 591–92, 706 S.E.2d at 787–88.

49. Throughout discovery and up until the time that Plaintiff filed its Motion for Partial Summary Judgment, Defendants never disputed that Plaintiff and Defendants entered into the Escrow Instructions, pursuant to which DEW was to act as escrow holder and Washington was to act as escrow officer. Defendants not only answered the Complaint by admitting that the parties signed the Escrow Instructions, but also affirmatively alleged in crossclaims brought against previously dismissed co-defendants that Alkemal and Defendants had signed the Escrow Instructions and that pursuant to those instructions DEW would act as Escrow Holder. (Answer 9, ¶¶ 5–6.) Additionally, Washington answered affirmatively when asked during his deposition if "DEW, as escrow holder, and you as escrow officer, were operating under these Joint Escrow Instructions with Alkemal[.]" (Pl.'s Br. Supp. Ex.

B, 29:22–30:1.) It was not until Alkemal filed its Motion for Partial Summary Judgment on September 8, 2017—almost two years after Defendants filed their Answer—that Defendants asserted, for the first time, that they dispute those factual allegations. (Defs.' Br. Opp'n 8.) Although Washington suggested in his deposition that the Escrow Instructions were not the entire agreement between the parties, he affirmed that Defendants were operating under the Escrow Instructions as escrow holder and escrow officer. (Pl.'s Br. Supp. Ex. B, 29:8–12 (stating that the Escrow Instructions were his "agreement with Alkemal in a certain aspect of it"), Ex. B, 36:17–19 (stating that there were "several contracts that also govern the transaction as a whole").)

50. The Court concludes, in its discretion, that the Motion to Amend should be denied based on Defendants' undue delay. Defendants filed the Motion to Amend on October 2, 2017—nearly two years after they filed their Answer and after briefing was complete on Plaintiff's Motion for Partial Summary Judgment. In addition, Defendants filed their Motion to Amend over six months after the deadline for filing amended pleadings set by the Case Management Order had passed, a deadline which the parties themselves requested. Further, Plaintiff provided Defendants with a copy of the Escrow Instructions that was not signed by Alkemal at Washington's deposition, which was taken more than three months before Defendants filed the Motion to Amend. (Pl.'s Resp. Opp'n 4–5; *see also* Pl.'s Br. Supp. Ex. B, at 3.) *See Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 679, 748 S.E.2d 154, 161 (2013) (affirming trial court's denial of plaintiff's motion to amend based on undue delay

when the motion was made one year and one month after plaintiff filed his original complaint and five days before the hearing on defendants' motion for summary judgment); *Williams v. Craft Dev., LLC*, 199 N.C. App. 500, 510, 682 S.E.2d 719, 726 (2009) (affirming trial court's denial of plaintiff's motion to amend based on undue delay when the motion was filed more than one year after plaintiff filed her original complaint); *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 447−48, 678 S.E.2d 671, 681 (2009) (affirming trial court's denial of defendant's motion to amend when the motion was filed almost four months after defendant filed its original answer and defendant did not offer any credible explanation for the delay); *Draughon*, 166 N.C. App. at 467, 602 S.E.2d at 724 (affirming trial court's denial of plaintiff's motion to amend based on undue delay when the motion was filed one year and eleven months after plaintiff filed her second complaint and less than one week before the hearing on defendant's motion to dismiss and motion for summary judgment); *Wall v. Fry*, 162 N.C. App. 73, 80, 590 S.E.2d 283, 287 (2004) (affirming trial court's denial of plaintiffs' motion to amend based on undue delay when the motion was filed one year and two months after plaintiffs filed their original complaint and after defendants filed motions for summary judgment); *Johnson v. Beverly-Hanks & Assocs., Inc.*, 97 N.C. App. 335, 341, 388 S.E.2d 584, 587 (1990) (affirming trial court's denial of plaintiffs' motion to amend based on undue delay when the motion was made seven months after plaintiffs filed their original complaint and there was nothing in the record to indicate why plaintiffs were delayed in moving to amend); *Wright v. Commercial Union Ins. Co.*, 63 N.C. App. 465, 469,

305 S.E.2d 190, 192 (1983) (affirming trial court's denial of plaintiffs' motion to amend based on undue delay when the motion was filed one year and two months after plaintiffs filed their original complaint, one year after defendant filed its answer, and one month after defendant filed its motion for summary judgment).

51.     Therefore, the Court, in its discretion, denies Defendants' Motion to Amend based on Defendants' undue delay.

## V.     PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.     Claims for Relief

52.     Alkemal seeks summary judgment on its claims for breach of contract, breach of fiduciary duty, constructive fraud, fraud, conversion, and UDTP.  (Pl.'s Mot. Partial Summ. J. 1, ECF No. 76.)

### B.     Legal Standard

53.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C. Gen. Stat. § 1A-1, Rule 56(c).  "A genuine issue of material fact is one that can be maintained by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference."  *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 335, 777 S.E.2d 272, 278–79 (2015) (citations and quotation marks omitted).  The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant

is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008). "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). The Court must view the evidence in the light most favorable to the non-movants. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. However, the non-movants "may not rest upon the mere allegations or denials of [their] pleading, but [their] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the non-movants] do[] not so respond, summary judgment, if appropriate, shall be entered against [the non-movants]." N.C. Gen. Stat. § 1A-1, Rule 56(e).

C. **Breach of Contract**

54. The Court concludes, based on the evidence and construing the facts in the light most favorable to Defendants as the non-moving parties, that a genuine issue of material fact exists as to whether the parties intended the transaction to be governed by the Escrow Instructions, on the one hand, or the Lease Agreement and Funds Release Agreement, on the other.

55. Alkemal asserts that it is entitled to summary judgment on its claim that Defendants breached the Escrow Instructions because there is no genuine issue of material fact that pursuant to the Escrow Instructions, which were binding on the

parties, Defendants breached their obligation to hold the Alkemal Funds in escrow until the conditions of the Escrow Instructions were satisfied.  (Pl.'s Br. Supp. 12.) Alkemal contends that, in violation of the Escrow Instructions, Defendants released the Alkemal Funds to Velocity Partners prior to Alkemal receiving any documentation of the standby letter of credit, much less being given three days to object to the authenticity of the documentation.  (Pl.'s Br. Supp. 12.)  As a result of Defendants' alleged breach, Alkemal claims to have been harmed in the amount of $2.6 million.  (Pl.'s Br. Supp. 13.)

56.    Defendants admitted that the parties signed the Escrow Instructions, pursuant to which "DEW and Washington would serve as the escrow holder and escrow officer respectively[,]" (Answer ¶ 16), and that Alkemal wired the funds to DEW's account "as required by the escrow agreement," (Answer ¶ 18).  Nevertheless, Defendants argue that the Escrow Instructions were only meant to govern if the parties decided that Defendants would facilitate the transaction directly, rather than arranging for an investor to facilitate the transaction.  (Defs.' Br. Opp'n 4–5.) Defendants further argue that Alkemal subsequently agreed that Avion would facilitate the transaction and that the Alkemal Funds would be held by a third-party escrow agent, as provided by the Lease Agreement and Funds Release Agreement. (Defs.' Br. Opp'n 9.)

57.    As evidence that Alkemal intended to be bound by the Lease Agreement, Defendants submitted the September 25th and the September 26th versions of the Lease Agreement, both signed by Singh on behalf of Alkemal.  (Defs.' Br. Opp'n Exs.

A.4–A.5.) Each version of the Lease Agreement referenced an Escrow Funds Release Agreement that was to be attached as an exhibit to the Lease Agreement. (*E.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(1)b(3).) The Lease Application, which is attached to the Lease Agreement as Exhibit A and signed by Singh, stated "I understand and agree that we will utilize an independent escrow agent and escrow agreement, both defined in Exhibit C, attached hereto." (*E.g.*, Defs.' Br. Opp'n Ex. A to Ex. A.4.) Exhibit C to the Lease Agreements, however, was titled "Escrow Agreement (Three Party Escrow Agreement)" but was an otherwise blank page to which no other document was attached. (*E.g.*, Defs.' Br. Opp'n Ex. C to Ex. A.4.) At the hearing on the Motions, Defendants' counsel argued that the parties intended the Funds Release Agreement, (Defs.' Br. Opp'n Ex. A.6), not the Escrow Instructions, to be the governing escrow agreement. Defendants contend that Washington, with Alkemal's full knowledge and consent, executed the Funds Release Agreement on September 29, 2014 in order to carry out the transaction by Alkemal's deadline because Avion would not proceed with the transaction until it "had a complete lease agreement, including an escrow agreement, executed by the lessee," which was identified as DEW in the September 29th Lease Agreement. (Defs.' Br. Supp. Ex. A, ¶ 25.)

58. In further support of this argument, Washington testified that when Alkemal was provided the September 26th Lease Agreement, Alkemal was also provided with the Funds Release Agreement that listed Velocity Partners as escrow agent "and was otherwise made aware by DEW of the identity of [Velocity Partners as] the escrow agent." (Defs.' Br. Opp'n Ex. A, ¶ 19.) Additionally, Defendants'

counsel argued at the hearing that Defendants had produced a "smoking gun" e-mail sent from Washington to Mwara on September 26, 2014, which stated:

> It is completely up to the client where they wish to wire the funds. If they wire funds directly to us we will have more control over the transaction and can coordinate directly with the provider to ensure that everything is handled immediately. If to the attorney escrow [sic] we will need to continuously follow up to make sure that funds are received. It is there [sic] call.

(Defs.' Br. Opp'n Ex. A.7.) Defendants' counsel represented that "attorney escrow" referred to Velocity Partners, a law firm in Massachusetts and that this e-mail proves that Plaintiff was aware of and agreed to Velocity Partners serving as the escrow agent. Although Washington testified that he sent this e-mail in response to an e-mail from Mwara asking whether Alkemal should wire the service fee to Velocity Partners or DEW, (Defs.' Br. Opp'n Ex. A, ¶ 20), no copy of the e-mail from Mwara was submitted to the Court.

59. Alkemal, on the other hand, disputes that it ever agreed to be bound by the Lease Agreement, noting that the Escrow Instructions provided that "[u]nless and until subsequently amended or cancelled in the manner provided herein, these Instructions shall constitute the complete and only Escrow Instructions of The Parties." (Pl.'s Br. Supp. 6; *see also* Pl.'s Br. Supp. Ex. D, § 5.01, ECF No. 78.4.) Alkemal acknowledged that it signed earlier versions of the Lease Agreement, but notes that it did not sign the final September 29th Lease Agreement, to which it is not named as a party, and that Avion did not sign any version of the Lease Agreement that was signed by Alkemal. (Pl.'s Br. Supp. 8.) Alkemal points to the Escrow Instructions' provisions that require any amendment or cancellation of the

instructions to be in writing and signed by Alkemal and DEW, (Escrow Instructions §§ 5.03–.04), and contends that no subsequent instructions or amendments were executed by Alkemal and DEW absolving Defendants of their obligations under the Escrow Instructions. (Pl.'s Br. Supp. 12.)

60.  As evidence of its assertions, Alkemal submitted Wasan's affidavit, which states that she was neither aware of nor consented to Velocity Partners acting as escrow agent for the transaction. (Pl.'s Br. Supp. Ex. A, ¶¶ 10–11.) Alkemal points to the fact that it did not sign any document that made specific reference to Velocity Partners. (Pl.'s Br. Supp. Ex. A, ¶¶ 12–13.) Indeed, none of the Lease Agreements mention Velocity Partners by name, referring only generically to the "Escrow Agent," (*e.g.*, Defs.' Br. Opp'n Ex. A.4, ¶ D.13(i)f), which was to be identified in Exhibit C to the Lease Agreement, (*e.g.*, Defs.' Br. Opp'n Ex. A to Ex. A.4). In addition, Wasan testified that she "specifically told Washington that [she] was not comfortable sending money to an escrow agent with which [she] had not been dealing." (Pl.'s Br. Supp. Ex. A, ¶¶ 10–12.) Wasan testified that "[i]t was always her understanding . . . that Washington and DEW would hold the Alkemal Funds in escrow, in their entirety, until the conditions in the Escrow [Instructions] had been satisfied[,]" (Pl.'s Br. Supp. Ex. A, ¶ 14), an assertion that is supported by her e-mails to Washington after Alkemal transferred the $2.6 million to DEW's account in which she told Washington "you are my escrow and I am unaware of any further agreements you have behind the scene [sic]." (Pl.'s Br. Supp. Ex. A.5, at 3.)

61. Based on the foregoing, the evidence reveals that a genuine issue of material fact exists as to which written agreement, if any, the parties intended to control the transaction. Defendants essentially argue that the Escrow Instructions were superseded or abrogated by the Lease Agreements and the Funds Release Agreement. The Escrow Instructions provided that cancellation could only be effected by "supplementary escrow instructions; or, a written notice that complies with the respective provisions of these Instructions relating to Amendments[,]" (Pl.'s Br. Supp. Ex. D § 5.04), which provision states that "[n]o amendment or modification of [the Escrow] Instructions shall be valid or effective unless and until being duly executed by all the Parties and being lodged with Escrow Holder[, DEW,]" (Pl.'s Br. Supp. Ex. D § 5.03). There is, therefore, some question as to whether the parties intended the September 26th Lease Agreement, which was signed by DEW and Alkemal as Lessees and contained substitute escrow instructions, to amend or cancel the Escrow Instructions.

62. "It is clear that parties may modify their agreement by entering into a new contract prescribing their rights and liabilities in regard to the entire subject matter and the new agreement amounts to a novation." *Penney v. Carpenter*, 32 N.C. App. 147, 149, 231 S.E.2d 171, 173 (1977). Our Court of Appeals has previously defined novation "as a substitution of a new contract or obligation for an old one which is thereby extinguished." *Bowles v. BCJ Trucking Servs.*, 172 N.C. App. 149, 153, 615 S.E.2d 724, 727 (2005). "The essential requirements of a novation are a previous valid obligation, the agreement of all the parties to the new contract, the

extinguishment of the old contract, and the validity of the new contract." *Anthony Marano Co. v. Jones*, 165 N.C. App. 266, 269, 598 S.E.2d 393, 395 (2004).

63.    However, the making of a second contract regarding the same subject matter as an earlier contract does not necessarily abrogate the earlier agreement. *Zinn v. Walker*, 87 N.C. App. 325, 336, 361 S.E.2d 314, 320 (1987). "Whether a new contract between the same parties discharges or supersedes a prior agreement between them depends upon their intention as ascertained from the instrument, the relation of the parties, and the surrounding circumstances." *Id.* at 335, 361 S.E.2d at 320; *see also Penney*, 32 N.C. App. at 149, 231 S.E.2d at 173.

> Where the question of whether a second contract dealing with the same subject matter rescinds or abrogates a prior contract between the parties depends solely upon the legal effect of the latter instrument, the question is one of law for the court, but where the second agreement does not show on its face that it must have been intended as a substitution for the prior agreement, and the facts relating to the intent of the parties are controverted, the question of intent is for the jury.

*Penney*, 32 N.C. App. at 149, 231 S.E.2d at 173 (quoting 2 Strong, N.C. Index 2d, Contracts § 19).

64.    Here, Plaintiff alleged and Defendants admitted that the parties signed the Escrow Instructions and that DEW and Washington would serve as escrow holder and escrow officer, respectively. (Compl. ¶ 16; Answer ¶ 16.) Washington further stated in his deposition that DEW, as escrow holder, and Washington, as escrow officer, were operating under the Joint Escrow Instructions. (Pl.'s Br. Supp. Ex. B, at 29:22–30:1.) There was, therefore, a valid agreement between the parties, and the question becomes whether the parties agreed to a new valid contract that

extinguished their rights and obligations under the Escrow Instructions. Commensurate with the Escrow Instructions' requirement that any amendment or cancellation be in writing executed by both parties, DEW and Alkemal both signed the September 26th Lease Agreement that provided procedures for the escrow transaction wholly at odds with those provided for in the Escrow Instructions. However, the parties' conflicting evidence as to whether the parties intended to remain bound by the Escrow Instructions or intended the transaction to be governed by the Lease Agreement and Funds Release Agreement creates a genuine issue of material fact that requires jury determination and thus precludes summary judgment.

65.    The Court, therefore, denies Plaintiff's Motion for Partial Summary Judgment as to its breach of contract claim.

D.    **Breach of Fiduciary Duty**

66.    "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Courts in North Carolina recognize that "a fiduciary duty can arise by operation of law (*de jure*) or based on the facts and circumstances (*de facto*)[.]" *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 351 (N.C. Ct. App. 2016). Thus, a fiduciary relationship will arise not only from "all legal relations, such as attorney and client, broker and principal, . . . [and] principal and agent," for example, "but it extends to any possible case in which there is a confidence reposed

on one side and a resulting domination and influence on the other." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004).

67. Plaintiff contends that it is entitled to summary judgment on its claim for breach of fiduciary duty because Defendants, pursuant to the Escrow Instructions, were Plaintiff's agents, entrusted to hold the Alkemal Funds in escrow until all conditions of the Escrow Instructions had been satisfied. (Pl.'s Br. Supp. 15.) Plaintiff asserts that by releasing the funds before the conditions of the Escrow Instructions had been satisfied, Defendants breached their duties to act in good faith and with due concern for Alkemal's interest, resulting in Alkemal's loss of the escrow funds. (Pl.'s Br. Supp. 15.)

68. Plaintiff relies on appellate cases standing for the proposition that "[a]n agent is a fiduciary concerning the matters within the scope of his agency." *SNML Corp. v. Bank of N.C., N.A.*, 41 N.C. App. 28, 37, 254 S.E.2d 274, 279 (1979). In *SNML Corp.*, our Court of Appeals found that defendant-bank, which agreed to act as escrow agent and not release securities held in escrow until certain conditions were satisfied, owed fiduciary duties to plaintiff by virtue of its agency relationship. *Id.* at 37, 254 S.E.2d at 279–80. In *SNML Corp.*, the fiduciary relationship arose as a matter of law. *Id.* However, whether a *de facto* fiduciary relationship existed between the parties is generally "determined by specific facts and circumstances, and is thus a question of fact for a jury." *See Stamm v. Salomon*, 144 N.C. App. 672, 680, 551 S.E.2d 152, 158 (2001).

69. As discussed above, questions of fact remain as to what role the parties ultimately intended Defendants to play in this transaction. If, as Plaintiff contends, Defendants remained bound to act as escrow holder and escrow officer under the Escrow Instructions, then they were Alkemal's agents and, accordingly, a jury may find that Defendants owed Alkemal fiduciary duties with respect to the transaction. Conversely, if, as Defendants contend, the parties agreed to be bound by the terms of the Lease Agreement and Funds Release Agreement whereby Velocity Partners was to serve as escrow agent, then a *de jure* fiduciary relationship would not exist between the parties by virtue of the Escrow Instructions. Even assuming *arguendo* that Defendants' position is correct, a genuine issue of material fact exists as to whether Defendants owed Plaintiff fiduciary duties by virtue of the special confidence that Alkemal allegedly reposed in Defendants by relying on them to facilitate the transaction and entrusting them with $2.6 million.

70. Taking all facts and inferences in the light most favorable to Defendants as the non-moving parties, the Court concludes that a genuine issue of material fact remains as to whether Defendants owed Plaintiff fiduciary duties. The Court, therefore, denies Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for breach of fiduciary duty.

## E. Constructive Fraud

71. To prove constructive fraud, Plaintiff must show "(1) a relationship of trust and confidence akin to that of a fiduciary and (2) that the defendant took advantage of that position of trust in order to benefit himself to the detriment of plaintiff."

*Sterner v. Penn*, 159 N.C. App. 626, 631, 583 S.E.2d 670, 674 (2003); *see also Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 329, 572 S.E.2d 200, 206 (2002). "Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 482, 593 S.E.2d 595, 599 (2004). "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the [additional] constructive fraud requirement that the defendant benefit himself." *White,* 166 N.C. App. at 294, 603 S.E.2d at 156.

72.  Having concluded that there is a genuine issue of material fact as to whether Defendants owed Plaintiff fiduciary duties, the Court denies Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's constructive fraud claim.

## F.  **Fraudulent Inducement**

73.  The essential elements of fraudulent inducement are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 609, 659 S.E.2d 442, 449 (2008). "Elements three and four comprise 'scienter,' both of which are required to show fraud." *Forbes v. Par Ten Grp., Inc.*, 99 N.C. App. 587, 594, 394 S.E.2d 643, 647 (1990).

74.  Alkemal argues that it is entitled to summary judgment on its fraud in the inducement claim because Defendants falsely represented that they would hold the Alkemal Funds in escrow until the conditions of the Escrow Instructions had been

satisfied, which representation was intended to and did in fact deceive Alkemal, thus causing Alkemal to wire the Alkemal Funds to DEW's bank account in reliance on the misrepresentation. (Pl.'s Br. Supp. 17–18.)

75.    As with Plaintiff's other claims, the fraud in the inducement claim depends on whether the parties intended to be bound by the Escrow Instructions or the Lease Agreement and the Funds Release Agreement.  The Court concludes that Defendants have proffered sufficient evidence that Plaintiff was aware of and consented to Velocity Partners acting as a third-party escrow agent so as to create a genuine issue of material fact.  Schedule 2 to the Lease Agreements, two of which are signed by Singh on behalf of Alkemal, stated that the "Leasing Fee [will be] paid into an escrow with a third party escrow[.]"  (*E.g.*, Defs.' Br. Opp'n sched. 2 to Ex. A to Ex. A.4.)  Exhibit A to the Lease Agreements, two of which are signed by Singh on behalf of Alkemal, similarly stated "I understand and agree that we will utilize an independent escrow agent and escrow agreement, both defined in Exhibit C."  (*E.g.*, Defs.' Br. Opp'n Ex. A to Ex. A.4.)  The two versions of the Lease Agreement that were signed by Singh list both DEW and Alkemal as the Lessee.  (Defs.' Br. Opp'n Ex. A.4 at 1, Ex. A.5 at 1.)  As a Lessee and a party to the Lease Agreement, DEW could not have been an *independent* escrow agent, suggesting that the parties contemplated another entity acting in that capacity.  Additionally, the e-mail from Washington to Mwara on September 26, 2014 suggests that the parties may have had some discussion regarding the use of an independent escrow attorney.  (Defs.' Br. Opp'n Ex. A.7.)

76. The Court concludes that the question of whether Alkemal agreed that Velocity Partners or some entity other than DEW would act as escrow agent is a disputed issue of material fact that goes to whether Defendants made a material misrepresentation to Plaintiff. Therefore, the Court denies Plaintiff's Motion for Partial Summary Judgment as to its fraud in the inducement claim.

**G.    Conversion**

77. "Conversion is the unauthorized assumption and exercise of the right of ownership over the goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *White*, 166 N.C. App. at 309, 603 S.E.2d at 165 (quotation marks omitted). "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012).

78. Plaintiff contends that it is entitled to summary judgment on its conversion claim because Defendants exercised dominion and control over the Alkemal Funds belonging to Plaintiff in violation of the Escrow Agreement. (Pl.'s Br. Supp. 18.) Because Defendants were not yet entitled to any part of the funds, Plaintiff contends that Defendants wrongfully converted the entire $2.6 million. (Pl.'s Br. Supp. 18–19.)

79. If the parties were at all times bound by and acting under the Escrow Instructions, then DEW, as Escrow Holder, would have been entitled to disburse the Financial Services Fee of $2.6 million to the provider of the standby letter of credit if

Alkemal did not inform DEW in writing that documentation of the standby letter of credit was unacceptable within three days. (Pl.'s Br. Supp. Ex. D, §§ 4.02, 4.04.) Thus, under those instructions, Defendants' release of the Alkemal Funds and their retention of a $400,000 fee would have been a wrongful conversion of Plaintiff's property because Washington admitted that he did not give Alkemal three days to determine whether the standby letter of credit had been properly issued, but rather released the funds within an hour of having received them. *See Se. Shelter Corp.*, 154 N.C. App. at 331, 572 S.E.2d at 207 (reversing grant of summary judgment on plaintiffs' conversion claim where defendants were not entitled to any of plaintiffs' assets until the end of the parties' business relationship as defined by contract).

80. However, Plaintiff's conversion claim hinges on what the parties intended to be the controlling agreement in this transaction. If Defendants were properly acting under the Lease Agreement and Funds Release Agreement, then as Lessee, they were obligated to deposit that money with the escrow agent, (Defs.' Br. Opp'n Ex. A.9, § M.21), which, under the Funds Release Agreement, was Velocity Partners, (Defs.' Br. Opp'n Ex. A.6, at 1).

81. Because Defendants have offered sufficient evidence to raise a genuine issue of material fact as to whether the parties intended the transaction to proceed under the Escrow Instructions, on the one hand, or the Lease Agreement and Funds Release Agreement, on the other, the Court concludes that Plaintiff is not entitled to summary judgment on its conversion claim.

**H.    UDTP**

82.    To establish a UDTP claim under N.C. Gen. Stat. § 75-1.1, "a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711. While the issue of whether an act is unfair or deceptive is a question of law for the Court, *id.*, "[w]hether defendants committed the alleged act is a question of fact for the jury[,]" *Forbes*, 99 N.C. App. at 600, 394 S.E.2d at 650–51 (quotation marks omitted).

83.    Plaintiff alleges that it is entitled to summary judgment on its UDTP claim based on its claims for breach of fiduciary duty, constructive fraud, and fraud. As the Court has concluded that genuine issues of material fact exist so as to preclude summary judgment on those claims, the Court likewise concludes that Plaintiff is not entitled to summary judgment on its UDTP claim.

## VI.    CONCLUSION

84.    For the foregoing reasons, the Court **DENIES** Defendants' Motion to Amend and **DENIES** Plaintiff's Motion for Partial Summary Judgment.

   **SO ORDERED**, this the 12th day of December, 2017.


                                        /s/ Michael L. Robinson
                                        _____
                                        Michael L. Robinson
                                        Special Superior Court Judge
                                          for Complex Business Cases